CHARLES ALDRICH *et al.*

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa November 10, 1881.*

1. CRIMINAL LAW—*receiving stolen goods and concealing same for gain, etc.—proof necessary.* In order to convict, under sec. 239 of the Criminal Code, for receiving and aiding in concealing stolen goods for gain, or to prevent the owner from recovering the same, etc., it is essential, first, to show that the property alleged to have been received or concealed was in fact stolen; secondly, that the accused received the goods knowing them to have been stolen, guilty knowledge being an essential ingredient of the crime; and lastly, that the accused, for his own gain, or to prevent the owner from recovering the same, bought, received, or aided in concealing the stolen goods.

2. Where the owner authorizes or licenses another to receive stolen goods, and such other person receives the goods from the thief knowing them to have been stolen, with a felonious intent, he will be guilty of a felony in receiving the property, notwithstanding the license.

3. SAME—*receiving stolen property—must be with criminal intent.* Where a defendant, on behalf of the owner, receives stolen goods from the thief, for the honest purpose of restoring them to the owner without fee or reward, or the expectation of any pecuniary compensation, and in fact immediately after obtaining their possession restores all he receives to the owner, and is not acting in concert or connection with the party stealing to make a profit out of the transaction, he will not be guilty, under the statute.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. ELLIOTT ANTHONY, Judge, presiding.

Mr. JOHN LYLE KING, for the plaintiffs in error, after stating and reviewing the evidence in detail, and in its various bearings upon the question of guilt, among various points made the following:

1. The statute makes the receiving of stolen goods by a party for his own gain, or to prevent the owner from obtaining their possession, the distinctive and sole criminal element of guilt in receivers of stolen property. Without such guilty intent the crime can not be committed.

2. The restoration of the goods to the owner was the express object of the scheme of Aldrich and Isaacs, and every step taken by them for getting the property was in that direction, and there is no evidence they were at any time seeking their own gain in the transaction.

3. The shortage in the goods restored is not attributable to the plaintiffs in error. Aldrich's sole possession of the property, and his sole personal knowledge of it, were confined to the five or ten minutes interval of its carriage from the cigar store to the Clifton House, and then in unopened packages, and with the belief and ambition of restoring the property intact. The shortage is no doubt attributable to the thieves, who confess to having retained a portion.

4. The fact, also, that $100 of the money given to Aldrich to procure a restoration of the goods from the burglars, which was not used, was returned to the owner of the goods, shows very clearly that Aldrich did not seek or act for his own gain. If actuated by a criminal motive he would have reported its payment to the burglars.

5. On the very night of the robbery Isaacs held the chance, for his own gain, of preventing the owner from repossessing his property, by buying it himself upon his own terms, if he had so desired.

Mr. Luther Laflin Mills, State's Attorney, for the People, in his printed argument, contended that Isaacs, the pawnbroker, and Aldrich, formerly in the police service, had learned and knew of the robbery, and knew the thieves, and concealed their names until the agent of the owner of the goods advanced money to be paid the thieves for a restoration, and thereby aided in the concealment of the goods until the thieves were paid for them, and were guilty, under the statute.

That the fact of an agency for the owner existed, does not exonerate the plaintiffs in error where they aided in concealing the goods for their own gain, or to prevent the owner from recovering the same until he paid money therefor, counsel cited 1 Wharton's Crim. Law, sec. 896, *et seq.*, and *People* v. *Wiley,* 3 Hill, 194.

Mr. Chief Justice Craig delivered the opinion of the Court:

This was an indictment in the Criminal Court of Cook county, against Charles Aldrich and Emanuel Isaacs, for larceny. In two of the counts it was charged, in the indictment, that for their own gain, and to prevent the owners from again possessing their property, the defendants did buy, receive and aid in concealing the goods of certain named persons, lately before feloniously stolen, the defendants well knowing they were stolen. The jury before whom the cause was tried returned a verdict of guilty of receiving stolen property, and found the property to be of the value of $6000. The court overruled a motion for a new trial, and rendered judgment on the verdict, and the defendants sued out this writ of error.

In order to obtain a clear understanding of the questions presented by the record, a brief statement of the facts seems necessary. On Friday night, November 26, 1880, four persons, Mike Bauer, Nick Bauer, Herman Schrœder and Mathew Ash, stole a trunk from the Clifton House, in

Chicago, belonging to J. H. Morrow, which contained jewelry belonging to Eaton & Faas, and Ernest Thoma, of New York, of the value of from $7000 to $8000. Morrow had the goods for sale as agent of the owners. On the night the trunk was stolen, one of the thieves, Mike Bauer, told the defendant Isaacs, who was a pawnbroker in Chicago, that he had a quantity of jewelry for sale, and offered to sell to the defendant, but he declined to buy. Bauer desired the defendant to see the goods, which he promised to do at a future day. On the following Sunday, Isaacs, in company with Bauer, went to a room where the latter had the goods concealed, and looked them over, and was offered the property for $600 or $700. Isaacs declined to buy, but told him not to be in a hurry, he would talk to him the next day. On Saturday night before this occurred, defendant Aldrich, a policeman, and one Levi, were at Isaacs' place, and the robbery having been mentioned, Isaacs remarked that he could have had the goods for a small sum of money. After obtaining this information from Isaacs, Aldrich and Levi conceived the scheme to recover the property and return it to the owners through Isaacs. On Monday a meeting was had between Aldrich and Morrow, at the Union National Bank, in the presence of Pinkerton, where Aldrich was employed as special policeman, which resulted in an arrangement that Aldrich should obtain the goods belonging to Thoma for $700, or less if he could, without disclosing the name of the person with whom he should deal, and without reward to himself, save only the reputation which he anticipated would follow the transaction, as a detective of stolen property. On the following Wednesday Morrow paid over to Aldrich $700, on the guaranty of the vice-president of the Union National Bank that the goods or money should be returned. On the same day Aldrich paid over to Levi $600 of the money, to be paid to the party who had the goods, through Isaacs, who alone knew such party. Out of the money thus received by Levi he paid over $450

to Isaacs. The $450 Isaacs paid to Bauer, who had the goods, as he testified; but Bauer says he only received of Isaacs $300. However that may be, upon the payment of the money to Bauer, on Wednesday evening, he took the goods, and, in company with Isaacs, carried them to a cigar store and barber shop on State street. Then Isaacs notified Levi where the goods could be found, and he notified Aldrich, who went to the place designated, found the goods, and within ten minutes carried them in unopened packages, precisely as he had found them, to the Clifton Hotel, and delivered them to Morrow. Bauer represented to Isaacs that the packages returned contained all the goods which had been stolen, those belonging to Eaton & Faas, and also those belonging to Thoma, and Isaacs and Aldrich both understood this to be the case, but upon a subsequent examination it is claimed there was a shortage of some $1300.

These are, in brief, the substantial facts, as we understand the testimony.

In the argument a number of questions have been presented in regard to the admission and exclusion of evidence, but we have concluded to base our decision on the merits of the case, and hence it will not be necessary to notice these questions.

The indictment in this case was found, and the conviction had, under section 239, chap. 38, of the Criminal Code, Rev. Stat. 1874, p. 388, which declares: "Every person who, for his own gain, or to prevent the owner from again possessing his property, shall buy, receive or aid in concealing stolen goods, or anything the stealing of which is declared to be larceny, or property obtained by robbery or burglary, knowing the same to have been so obtained, shall be imprisoned in the penitentiary," etc. On an indictment under this section of the statute for receiving stolen goods, the first thing to be proven is, that the property alleged to have been received was stolen. In this case, however, there is no controversy over that question. It is conceded that the goods in question

were stolen. Indeed, several of the thieves who stole the property were introduced as witnesses, and testified to the larceny of the goods. After the larceny has been proven it becomes necessary to establish the fact that those accused of the crime received the stolen goods knowing them to have been stolen. Guilty knowledge on the part of the defendant is essential to the constitution of the offence. Wharton, vol. 2, sec. 1889.

The intent, as in larceny, is the chief ingredient of the offence. Thus, where A authorizes or licenses B to receive property lost or stolen, and B receives the property from the thief knowing it to be stolen, with a felonious intent, he is guilty of a felony in receiving the property, notwithstanding the license. Wharton, sec. 1891.

Under our statute there is another essential fact to be proven,—that is, that the defendant, for his own gain, or to prevent the owner from again possessing his property, bought, received or aided in concealing stolen goods. There is no doubt, from the evidence in this case, in regard to the fact that the defendants knew the goods were stolen. Their knowledge is a conceded fact. It is also an undisputed fact that the stolen goods, in passing from the custody of the thieves to ·Morrow, the agent of the owners, passed through the hands, first, of defendant Isaacs, and, second, through the hands of defendant Aldrich. The question in the case is then narrowed down to this: Whether defendants received the goods for their own gain, or to prevent the owner from again possessing his property. This, in our judgment, is the turning point upon which the decision of the case must hinge. In the disposition of the question we will consider the case, first, as to the defendant Aldrich, and second, as to the defendant Isaacs, as the facts relating to each defendant are somewhat different.

It is not claimed that Aldrich undertook to secure the return of the goods for any fee or reward whatever, or that

he expected to make any money out of the transaction. On the contrary, it was proven by the prosecution that all he wanted was the reputation of recovering the goods. Upon this point Morrow testified: "Prior to the time the goods were returned, Aldrich said he didn't expect to make a cent out of the transaction; said this on Monday; he never asked for any compensation, or made offer, bargain or proposition for compensation; he said all he wanted was the glory of beating the other fellows in getting the goods." The city authorities and Pinkerton were after the goods. He never asked a dollar. It is true he retained in his possession $100 of the money which Morrow gave to him, but this was not kept for his own benefit, but for the benefit of Morrow. Upon this point the same witness testified: "On Wednesday night he said he had got all the goods, instead of a part, and that he had saved me $100." How could he save for Morrow $100 if the money was retained for his services? This could not be the case, as he had paid over to Levi all he received of Morrow, except this $100.

It is apparent, from the evidence, that no agreement was ever made under which Aldrich was paid anything for his services,—that he expected nothing and received nothing for the services he rendered in securing the return of the goods. How can it then be said that he received the goods for his own gain? Nor did he receive the goods to prevent the owner from again possessing his property, but, on the other hand, he received them for the very purpose of restoring them to the owner, which he did within ten minutes from the time they came into his possession.

We will now consider the testimony as to the defendant Isaacs. He was a pawnbroker, and on the night the goods were stolen he was approached by one of the thieves, and requested to buy the goods. This he refused to do, but having obtained information as to the custody of the goods, he undertook, afterwards, to assist Aldrich in the consummation

of his scheme to obtain the goods and restore them to the owner. There was no contract or agreement under which he was to receive any pay for what he might do in the premises. All that he did was done as a favor to help Aldrich, who wanted the credit of getting the goods returned. Levi, who held $600 to be paid for the return of the goods, handed Isaacs $450, and retained the balance until it could be ascertained that all the goods were returned. This sum Isaacs testified he paid over to Bauer, but Bauer swears that Isaacs only paid him $300, promising to pay the balance the next day. This is the only evidence contained in the record tending to show money in the hands of Isaacs as compensation for what he did in the transaction. We do not regard the evidence sufficient. Conceding that the credibility of the two men is equal, which is quite as favorable a view on the side of the prosecution as they could ask, it would leave the matter standing one oath against another, which, under the circumstances of this case, could not be regarded as establishing the fact beyond a reasonable doubt.

Again, if Isaacs had been endeavoring to make money out of the transaction, it is strange he did not avail of the opportunity to buy all the goods for the $600 for himself, and say nothing to the detectives in regard to the matter. This would have been the course he doubtless would have adopted had he undertaken to get the goods for his own gain. The fact that he did not take this course is a circumstance tending to corroborate his evidence that all he did was without pay or reward. If, then, Isaacs received no compensation, and had no arrangement under which he was to be paid for what he might do, we perceive no ground upon which it can be determined that he received the goods for his own gain, or that he received them to prevent the owner from again possessing his property, within the meaning of the statute.

It may, however, be said, that as the goods passed through defendants' hands they should be held liable for the shortage

of $1300, and in this way they received the goods for their own gain. If they retained the goods that were missing there might be force in the position, but from the evidence that was impossible. Isaacs only saw the property on two occasions: first on Sunday, when he looked it over in the presence of Bauer, who does not pretend that Isaacs offered to take any part of the goods; again on Wednesday evening, when the goods were carried by Bauer from Fourth avenue, in packages, to the cigar store. While Isaacs was in company with Bauer, at the time, it does not appear that he in any manner handled the goods. As to Aldrich, his only possession of the property was during the ten minutes which it took him to carry the goods from the cigar store to the hotel, when the property was in packages, and unopened. We can see no ground upon which it can, from the evidence, be claimed that either of the defendants can be held liable for the shortage in the goods. The more reasonable view is, that the missing articles were taken by the thieves and appropriated to their own use while they had the goods in possession.

It is, however, urged, that the fact that the property could have been returned soon after the larceny for $500, and the fact that Aldrich, in his first interview with Morrow, in substance said it would require $1400 to obtain the property, the long pendency of the negotiations as to the amount to be paid, and the fact that $200 more was paid to Aldrich than was demanded by the thieves, are facts which prove the motive of gain. As we understand the evidence, the defendants could not at any time have obtained possession of the property so it could be returned, without paying the thieves the amount of money demanded by them. The defendants can not, therefore, be blamed for the delay, as they acted as soon as Morrow furnished the money to be paid to the thieves. It is true, Aldrich, in his first interview with Morrow, expressed the opinion that $1400 would be required to obtain the property,

and this may be regarded as a circumstance against him; but his subsequent conduct, agreeing to obtain the property for one-half that sum, or as much less as he could, clearly repels the inference that he was seeking to make any gain out of the transaction. It has been suggested that Levi was a myth—that no such person ever lived. The fact that he was never seen or heard of after the night the goods were returned looks somewhat suspicious, but we must be controlled by the evidence in the record, and unless Isaacs, Aldrich, and also the father of Aldrich, are guilty of willful perjury, then Levi was no myth, but was in Chicago at the time of this occurrence, and participated therein, as testified by the defendants.

We have given the evidence in the record a careful consideration, and the only conclusion we have been able to reach is, that it has not been established that the defendants were receivers of the goods for their own gain, or to prevent the owners from again possessing their property. On the other hand, the only logical conclusion that can reasonably be reached from the evidence is, that defendants undertook, on behalf of the owners, to obtain a return of the goods without compensation or reward, and that all of the goods which came into their possession were in good faith returned to the owners. If it had been proven in this case that the defendants had entered into negotiations with Morrow to secure a return of the stolen goods in pursuance of a prior arrangement or understanding with the persons who had stolen the property, with the intent or purpose of making a profit out of the transaction, we would not hesitate to hold that they were guilty, under the statute. A party can not shield himself behind a supposed agency, growing out of an agreement made with the owner of stolen goods for their return, where it appears he is acting in conjunction with the thieves to make a gain or profit out of the transaction. But where the defendants are not actuated by the motive of gain, as they were not in this

case, and do not aid in secreting the property, we do not understand that a conviction can be had.

The judgment will be reversed and the cause remanded.

*Judgment reversed.*